JAMES HEDDON'S SONS, Inc., et al. v.
SOUTH BEND BAIT CO.

(Circuit Court of Appeals, Seventh Circuit.
March 6, 1926.  Rehearing Denied
September 17, 1926.)

No. 3540.

1. Patents ⬡⟿328.

Dills' patents, No. 1,323,458, for bait with finish resembling fish scales, and No. 1,391,670, for process, *held* not anticipated, to involve invention, and infringed.

2. Patents ⬡⟿62.

Testimony *held* not to sufficiently describe artificial minnow bait used by deceased, nor process by which it was made, to constitute prior public use.

Alschuler, Circuit Judge, dissenting in part.

Appeal from the District Court of the United States for the District of Indiana.

Suit by James Heddon's Sons, Incorporated, and another, against the South Bend Bait Company.  From an adverse decree, plaintiffs appeal.  Reversed, with directions.

Samuel W. Banning, of Chicago, Ill., for appellants.

R. G. Lockwood and V. H. Lockwood, both of Indianapolis, Ind., for appellee.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

EVAN A. EVANS, Circuit Judge.  Two patents, known as the Dills patents, one a product (No. 1,323,458), and one a process (No. 1,391,670), are involved in this suit. Invalidity of both patents is asserted as the basis for the district court's decision.

[1] The patents deal with fish baits, and the prior art is as crowded as might be expected in view of the subject-matter.  In this prior art there were innumerable bait lures which resemble minnows—lures which in shape, size, and general appearance were good imitations; lures with eyes, tails, fins, etc., so placed as to cause deception of the ordinary fish; lures so constructed and shaped that, when pulled through the water, they would dart back and forth, or up and down, in imitation of the movement of the live minnow.  All of these lures were well, if not overly, supplied with hooks that would fasten themselves when struck by the fish.

Plaintiff, nevertheless, contends that, notwithstanding the prior art, his contribution was novel and represented invention. He sought to attain still greater attractiveness, and to simulate more perfectly the live minnow.  To accomplish this end he placed scales on these lures, the many types of which have just been referred to.

The question is thus restricted to the dress of the artificial minnow, a dress which, when applied in the manner and way designated, would closely resemble the scale of a fish.  The process patent perhaps best describes Dills' problem and how he solved it.  He says:

"Numerous attempts have been made heretofore to produce a bait having a finish in imitation of the scales of a fish, but none of them have been successful so far as I am aware.  The object of the invention is to provide an attractive bait having a finish closely resembling a minnow and to accomplish the same in a novel manner.

"In carrying out the invention I first apply to the usual bait body one or more coats of coloring matter of the desired color or colors to form a background.  I then wrap about the body a flexible stencil, having its cut-out portions closely imitating in outline the scales of a fish, and then apply a coat of coloring matter to the surface of the stencil, either by rubbing or by an air brush.  The best results are obtained by using coloring matter in powdered form of the desired color and applying it with an air brush.  A cheap and advantageous stencil is cloth screening or mosquito netting, since it readily conforms to the shape of the bait body.  The coloring matter passes through the meshes of the screen and adheres to the surface of the bait between the strands of the screen.  Then the screen is removed and further coloring matter is applied at selected points, if desired, and the body is then lacquered or otherwise finished off with a transparent coat."

The attack is directed to all claims, and we need not consider each one separately. A typical claim of the process patent is No. 7, which reads as follows:

"The method of representing fish scales on a fish bait body, which comprises applying a coating of the color of that part of the fish bait body which is shown between the scales, then wrapping a flexible thread network closely about the body, in such manner that the individual scales are outlined by the thread, then applying a coating of the color of the scales of the fish over the thread and over the first coating, and then removing the thread network to expose the underneath coating as a network of uniformly defined lines."

The product patent is described by patentee as follows:

"In order to give a general idea of my

invention, it is here stated that the particular embodiment of my invention disclosed in this application comprises a cigar-shaped wooden body, to which various coatings of coloring material are applied. The body is provided with a coating forming a background of nonlustrous coloring material; a flexible cloth netting is then wrapped closely around this body, and a coating of lustrous coloring material is sprayed onto the body through the netting. The netting is then removed, leaving an interrupted coating of lustrous coloring material overlying the background of nonlustrous coloring material; the nonlustrous coloring material being visible through the interruptions of the outer coating in the form of a network. Other coatings of coloring material may then be applied to various parts of the body of the bait over the coating of lustrous coloring material, to form any desired color scheme, and a coating of transparent lustrous lacquer may then be applied over the entire surface of the bait.''

Claim No. 4 may be accepted as typical: "A fish bait having a first coating of light-colored nonlustrous material on the lower portion, a second coating of dark-colored nonlustrous material on its upper portion, and a third coating of lustrous coloring material overlying both said first and second coatings and forming an interrupted layer, the interruptions of which form a network dividing said third coating into a multiplicity of polygonal figures, between which figures said first and second coatings are visible as different colored networks.''

Figure No. 1 of the drawing is herewith reproduced to show the scale effect.

It may be conceded that the prior art existed as appellee describes it; that is to say, it was old to make fish baits and place fish scales thereon; old to apply colors to an artificial minnow, a fish bait; old to place one coat of paint over another, and thereby obtain better or more desirable results; old to use the stencil in applying colors to fish baits; and it was old to use a stencil or netting on innumerable objects, but not to fish baits, to obtain certain desired designs or configurations.

With this statement of the prior art fully conceded, the fact remains that the process Dills describes was new. The product claims cover a combination of elements never before assembled in the manner therein designated. These process claims produce, and the product claims describe, a new thing. True, it was still a fish lure, an artificial minnow. But it better or differently simulated the real scales of a fish, and it could be successfully manufactured at a cost that would permit of its ready sale to fishermen.

That the prior art did not anticipate either the process or product claims is a conclusion not open to serious dispute. It must have been, therefore, the position of the District Judge, as it is now the contention of the appellee, that the state of the prior art was such that Dills' advance represented merely mechanical skill, rather than invention. This position must be rejected, largely on the testimony showing appellee's attitude toward this bait when it first made its appearance on the market.

When Dills' bait was first brought out, appellee was one of the largest and most successful manufacturers and producers of fish baits, including artificial minnows. The James Heddon's Sons was another corporation engaged in the same business, and was also a large producer of artificial baits. Mr. Heddon was not only the president of the James Heddon's Sons Company, but he was an executive officer of appellee. The relations between the two companies were therefore close. Appellee evidenced its concern over the appearance of the Dills' bait and the impression it was making on the public, as well as its own inability to understand how the scale effect was produced, in a letter written November 21, 1917. It read:

"James Heddon's Sons, Dowagiac, Michigan—Gentlemen: Please send us a sample of your Zaragossa minnow bait in the scale finish. *We are particularly interested in the scale finish. Have been experimenting for some little time and have it pretty well solved* for the producing of this finish. The education and campaign of the Chub Creek Minnow bait, who brought out the scale finish, have created a demand for such finish. Inasmuch as you have well

solved that method of procuring the finish, we would ask that you kindly give us such information as you may care to for the obtaining of best results. The co-operation will be appreciated.

"Faithfully yours,

"South Bend Bait Company."

Dills' bait had been on the market for a year when this letter was written. It had become a dangerous competitor during the fishing season of 1917. Appellee was evidently concerned over the demand that promptly manifested itself. It therefore wrote this damaging letter. Yet appellee now asks the court to find that those skilled in the art could readily have originated this product and in the manner defined by Dills, even though it, especially skilled in this art, could not ascertain how the scale effects were produced, with the finished product before it to study and analyze. The ken of the man "skilled in the art" is not easy to define in many cases, but fortunately, in this case, appellee has furnished itself as the yardstick for measuring the skill of this man so trained in this art. It has demonstrated that Dills' bait and Dills' process represented something more than mechanical skill.

Appellee insists, however, that, notwithstanding its damaging admissions made in 1917, the court should now find that patentable novelty did not reside in Dills' combination, or in the process for making the bait. In support of this position it contends that Dills was working in the painter's art, and therefore knowledge of the practices of that art was chargeable to him. In other words, it is contended, he merely used the flexible stencil or netting to produce a desired configuration, and, as that was old in the decorator's art, Dills' fish scales were merely the product of mechanical skill.

Was this all of Dills' idea? The use of netting and flexible stencils in the decorator's art was to produce on lamp shades, etc., designs that were attractive to the eye and artistic in character. This merely reproduced; it did nothing more. If the netting or flexible stencil was of an attractive or desired configuration, its reproduction on another object was likewise artistic and attractive. Dills, however, was not interested in reproduction, as such—not interested in artistic effects. He wanted a new product, a different effect—a simulated fish scale. He was not interested in the size, shape, or attractiveness of the original flexible stencils or netting. He sought and se-

cured, in connection with other elements, a scalelike effect on a wooden bait. More than this, he described a process for making this scale effect which was inexpensive, and the finished product was within the reach of the prospective buyers.

To the extent that these fish scales, these reproduced flexible net configurations, are attractive or appeal to the æsthetic sense, his work may be described as a work of art. But the object he sought, the article he produced, was not a work of art, but a bait which would make live fish strike at it more readily than at other baits. Perhaps it would be more accurate to say that Dills' object was to produce a bait which the sportsmen who used it believed fish would strike at more readily; for Dills was, no doubt, producing a product to sell to the fishermen, not to the fish. The fishermen's recreation and resulting pleasure may well be of two kinds, fishing and catching fish. Fishing tackle may be "useful," as defined by statute, even though used exclusively in "fishing."

It is unnecessary to refer to the evidence showing the popularity of this bait, nor the large sales which immediately followed its appearance on the market. These facts would, perhaps, have some influence on our opinion, if we were in doubt. But it is not necessary to supplement the foregoing reasons for upholding the patent. There is more doubt about the validity of the products patent than the process patent. We agree with appellee however when he says with commendable frankness: "The two patents must stand or fall together."

[2] There were two other defenses interposed to the validity of these patents. One was prior public use. In support of this defense, defendants attempted to show that one Mundwiler designed a fish bait, in 1898, similar to the bait described in the Dills patent. Mundwiler was dead. His widow, his son, and his son-in-law all testified in reference to the bait. Neither his widow nor his son-in-law in the remotest way identified the bait which Mundwiler devised as being a scale-finished bait. We do not think the testimony of the son sufficiently described the bait, nor the process by which it was made, to constitute a prior public use under the rules of Deering v. Winona Harvester Works, 155 U. S. 286, 301, 15 S. Ct. 118, 39 L. Ed. 153; Symington Co. v. National Castings Co., 250 U. S. 386, 39 S. Ct. 542, 63 L. Ed. 1045; Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 481, 489, 11 S. Ct. 846, 35 L. Ed. 521.

The other defense relates to an alleged collusive agreement between Dills and one Pfleuger. Pfleuger and Dills were both applicants for patents. The Patent Office ordered an interference, and while this contest was pending, Pfleuger withdrew. We find nothing in the correspondence between them that would justify a finding that these parties entered into a collusive agreement to allow the patent to go to the one who was not the inventor.

The decree is reversed, with directions to enter one sustaining both patents and directing an accounting.

ALSCHULER, Circuit Judge (dissenting). While to my mind the process patent hangs on a thread quite slender, the product patent is, I believe, without even that support. The idea of an artificial fish bait showing scales was not new with this patentee. It was long before illustrated in prior patents, and in practice had been painted on the bait. The larger degree of perfection in appellant's scales comes from the employment of his process. One should be privileged to scale his bait to his heart's content, so long as he does not employ the Dills method for doing it. I am not in accord with so much of the opinion as holds valid the Dills patent, No. 1,323,458.