## GENERAL ELECTRIC CO. v. UNITED STATES ELECTRIC MFG. CO.

District Court, S. D. New York.
March 10, 1932.

On final hearing of a suit in equity by the assignee of two patents, based, as to the first, on an alleged infringement of claims Nos. 1 to 8 of United States patent No. 1,567,863, applied for on January 3, 1923, and issued to Howard R. Sargent and Frank C. De Reamer on December 29, 1925, for a house wiring structure, hereinafter referred to as the Switch Alignment patent, and, as to the second, on an alleged infringement of claims Nos. 1 to 8 of United States patent No. 1,567,864, applied for on February 13, 1924, and issued to Howard R. Sargent on December 29, 1925, for a wall attachment means for electrical devices, hereinafter referred to as the Scoring patent.

Charles Neave, of New York City (Harrison F. Lyman, of Boston, Mass., of counsel), for plaintiff.

Gifford, Scull & Burgess, of New York City (George F. Scull and Charles W. Mortimer, both of New York City, of counsel), for defendant.

WOOLSEY, District Judge.

■ I hold that claims Nos. 1 to 8 of United States patent No. 1,567,863, the Switch Alignment patent, are invalid for want of invention.

■ I also hold that claims 1 to 8 of United States patent No. 1,567,864, the Scoring patent, are invalid for want of invention.

Accordingly a decree may be entered providing for a dismissal of the bill of complaint herein with costs.

I. This is a suit under the patent law and there is not any question involved either as to venue or as to ownership of the patents by the plaintiff and infringement is not disputed. The sole question raised is as to the validity of the two patents.

As to the first, or Switch Alignment patent, the defendant claims it is invalid owing to anticipation by the Tirrill, United States patent No. 1,161,361, granted November 23, 1915, and also for lack of invention over the prior art in which reference is made to the Tirrill patent just mentioned, and also, more

emphatically, to the British patent, No. 102,167, to Herbert Edward Mitchell, issued for "improvements in or connected with Mountings for Electric Switches and Connecting Apparatus," granted on November 23, 1916.

As to the second, or Scoring patent, the defendant claims that it represents merely a trifling improvement on the first patent, and does not in the change therein made show the exercise of anything more than slight mechanical skill.

II. United States patent No. 1,567,863, the Switch Alignment patent:

A. This patent is thus described in its specifications:

"The present invention relates to house wiring and particularly to the mounting of switches or other electrical wiring devices, such as plug receptacles for example, in outlet boxes. In wiring houses the outlet boxes are usually fastened to the studding before the building is lathed and plastered and it often happens that boxes are set crooked so that the plane of the box opening is not parallel to the plane of the plaster surface. As a result when the switch or other device is mounted on the box it will stand crooked with respect to the plaster surface which means of course that the switch is not straight.

"The object of our invention is to provide an improved structure or arrangement wherein the switch will always come parrallel with the plaster surface irrespective of the manner in which the box is set, and for a consideration of what we believe to be novel and our invention, attention is directed to the accompanying description and the claims appended thereto."

Whilst claims Nos. 1 to 8 of the patent are all claimed to have been infringed, the plaintiff states that claim 6 and claim 8 are typical.

Claim 6 reads as follows (italics mine): "6. In combination, an electrical wiring device, supporting means projecting beyond its ends and provided with openings to receive fastening means for mounting it in an outlet box, and *ears formed integral with said supporting means and adapted to engage the surface of a wall when the device is mounted in an outlet box in the wall."*

Claim 8 reads as follows: "8. A cross bar for an electrical wiring device for use in mounting it in an outlet box, said cross bar being provided with openings at its ends to receive fastening screws for attaching the device to an outlet box, and having ears formed integral with it at its ends and extending beyond said openings."

In the Mitchell British patent, No. 102,167, which is the defendant's principal reference in the prior art, the patentee in his provisional specifications says: "In practice difficulties arise in mounting such apparatus due to the unknown finished surface line of the wall or plaster; and also due to want of accuracy in setting the receptacles in the walls."

After describing his figures he says: "It will be seen from the assembling of the parts shown in Figure 1 that if the receptable is not set with its front edges parallel with the face of the wall the corner fixing screws will correct this fault by drawing two (or more) corners of the cradle down to the required degree below the other two corners resulting in the flanges of the frame always bearing truly on the surface of the wall or plaster."

In his complete specification Mitchell says:

"My invention relates to improvements in or connected with mountings for electric apparatus such for example as switches, connecting sockets and bell pushes, on walls or partitions of buildings, where these are enclosed in receptacles built into the walls— such as iron wall-boxes used in connection with the tube system of electric wiring now in vogue. And it belongs to that type in which the wall-boxes are buried in the plaster and within which wall-boxes, frames, sometimes termed saddles or carriers, are inserted, the said frames being designed to directly support the switches, puches or other devices.

"The objects of all inventions of this type are to facilitate the work of erection of the apparatus to be mounted, to make satisfactory provision for space inside the receptacles for the accommodation of connecting wires and so forth and to give easy access to the parts of the apparatus.

"In practice the intention in all inventions of this type is to leave the front edges of the wall box flush with the surface of the plaster on the wall, but difficulties arise in mounting the apparatus due to the unknown finished surface line of the wall or plaster and also due to want of accuracy in setting the receptacles in the walls. Thus when the wall-boxes are being fixed the plasterers are asked to say where their finished surface will be, and the boxes are fixed in accordance with the reply given. When the plasterers start their work a string is stretched from corner to corner of a room across the wall, and they work to this line. When the work is finished it is

generally found that the fronts of the wall-boxes are standing either behind or in front of the finished surface. If the boxes project seriously in front they have to be cut out and sunk and if behind the switches (or other apparatus to be placed in the wall-boxes) have to be packed up and plaster edges are left exposed in front of the boxes giving rise to trouble from grit. The workmen fixing the boxes frequently leave them with the front edges out of parallel with the surface of the wall, and again frequently fix them with the top and bottom edges out of parallel with the floor; and it is not always easy to adjust them with exactness as to position, and in any case this involves a considerable amount of labour."

Then, after describing his figures, he says (italics mine): "But *with my invention all that need be done is to insert the cradle so that its thin flanges rest on the surface of the wall and then tighten up the screws. If the wall-box is not parallel with the wall surface, it will not matter, as all that happens is that one or more of the screws will have to be tightened more than others and the cradle is bound on account of the flanges to be in proper position with respect to the wall surface.*"

The Mitchell patent has not the unusual simplicity involved in the plaintiff's patent.

Shortly described, the device of the Mitchell patent consists of what the patentee calls a "cradle," which is a box made of metal open at the top and by so much smaller and shallower than the wall box as to enable it to fit inside thereof and to allow space at the bottom thereof for the wires leading into it.

This cradle, which is held in place by screws in its four corners, has thin flanges about half an inch wide made by bending the edges of each of the four sides at a right angle. When these thin flanges rest on the surface of the plaster, the bottom of the cradle is parallel with the plane of the plaster, with the result that the switch, fastened in the cradle to what is called a saddle by screws, automatically emerges from the plane of the plastered wall at the proper angle thereto.

This Mitchell device is very safe because the switch is almost entirely surrounded by metal and, consequently, the risk of fire due to the use of the switch is practically eliminated and the danger of wear and tear on the switch itself from grit or other foreign substance getting into its working parts is minimized. But it is a cumbersome device and much more difficult to assemble than the device of the plaintiff's patent.

The simplicity of the plaintiff's device, while, of course, it does not militate against its having been the result of invention, Potts v. Creager, 155 U. S. 597, 608, 15 S. Ct. 194, 39 L. Ed. 275, does not in and of itself constitute invention.

It is worthy of mention in this connection that in view of the Mitchell patent the main stress of the plaintiff's argument had to be put on the obvious simplification of the problem achieved by the plaintiff's device over that of Mitchell.

It was always necessary to have the switch strongly set in the wall box in order that it might stand the recurrent jar involved in its use. That problem had been easily solved. But the question which had long faced the art was how to find an easy method of fixing the position of the switch so that it would be level with the plaster and in such a position that it could be easily covered by the brass finishing plate. The method usually followed was to level the support for the switch from within the wall box by metal washers.

The invention claimed by the plaintiff's assignors is that, by allowing the spatulate extensions or ears of the plaintiff's patent to rest on the plaster at the ends of the wall box, the correct position of the switch was automatically achieved and the problem neatly and simply solved with a minimum of parts and with practically no effort by the assembler.

Whether or not there is invention in a given case is, of course, a question of fact, or perhaps, more accurately stated, it is a question of the proper inference to draw from known facts. Cf. Kurtz v. Belle Hat Co., 280 F. 277, 279 (C. C. A. 2).

After most careful consideration of the facts, I find that, in the instant case, Sargent and De Reamer achieved the same result as did Mitchell, namely, the leveling of the electric switch in its proper relation to the plaster of the wall, by the same means, namely, by allowing a member integral with the switch combination to rest on or overlie the plaster and thus always to achieve automatically the correct position for the switch.

The difference between the structure of the Mitchell patent and of this patent was thus explained by the examiner on October 13, 1925, in his rejection of the application for this patent, when, after describing the problem facing the art and the identic methods of its solution shown by the Mitchell patent and the patent sought by Sargent and De Reamer, he said: "The difference in structure between the British device, and the present

invention is due mainly to the difference between the British and American switches. There is no novelty in the switch support disclosed except in the extension and it is held that to supply such old form of switch support with an extension at each end to rest on the plaster around an outlet box to position the switch would not be invention in view of the British patent. The claims are all rejected."

I do not think that the subsequent changes in the claims, which resulted, without any further opinion from the Patent Office, in the allowance of the patent, were such as in any way to obviate the implicit objection thereto which was mentioned in the examiner's opinion and which underlay the whole situation.

It is certain, moreover, that the alternative form of the plaintiff's device as shown on the second page of the figures with the rectangular frame which was to overlie the plaster on all four sides of the wall box is almost a precise copy of the leveling element of Mitchell's device and is obviously within the teaching of his patent.

█ The subject-matter of a patent is not the result attained thereby, but the particular means devised by the inventor to attain that result, and, while it is open to any other inventor to reach the same result by other means, Electric Signal Co. v. Hall Signal Co., 114 U. S. 87, 96, 5 S. Ct. 1069, 29 L. Ed. 96, he may not use the same means to reach the same result.

I think, therefore, that it is inescapable that the plaintiff's Switch Alignment patent is void for want of invention.

B. In view of my decision that the plaintiff's first patent is invalid for want of invention, it is unnecessary to consider the defense of anticipation by United States patent No. 1,161,361 granted on November 23, 1915, to Tirrill for an electric switch.

III. United States patent No. 1,567,864, the Scoring patent:

A. It is contended by the plaintiff that all the claims in this patent are infringed.

The specification describes the Sargent and De Reamer Switch Alignment patent, and then says:

"The present invention relates to electric house wiring, and more especially to flush wall receptacles, switches, etc.

"Flush wall electric devices are generally installed in sheet steel boxes secured in the wall and the device attached to the front edge thereof by screws passing through attaching lugs on the device and engaging threated ears on the box. Formerly the attaching lugs were made relatively small and the finish wall plates were hollowed out at the back thereof to fit over the relatively small switch lugs. Much difficulty has always been experienced in getting the switch boxes installed properly to align with the surface of the plaster when completed. It has accordingly been the practice during recent years to provide the electric wall devices with ears having side enlargements or wings so that they may bear against the surface of the plaster and thereby automatically and correctly position the electric device, irrespective of the position of its box.

"It has been found, however, that the enlarged attachment lugs are sometimes objectionable, such as the failure of old forms of finish plates to fit thereover, or other nearby devices to interfere therewith.

"The object of my invention is to provide an improved electric device attachment ear of the enlarged or winged type that can be converted with facility to the small or old type of lug."

It is contended that all the claims of this Scoring patent are infringed.

The plaintiff states that claims Nos. 1 and 8 may be regarded as typical.

Claim No. 1 reads: "1. The combination with an electrical device having supporting lugs projecting beyond its ends for use in mounting it in an outlet box, of integral extensions on said lugs adapted to engage the surface of a wall when the device is mounted in an outlet box in the wall, the line of connection between the lugs and extensions being weakened whereby the extensions may be severed readily from the lugs."

Claim No. 8 reads: "8. A bridge piece for electrical devices, the ends of which form lugs provided with openings adapted for use in attaching the bridge piece to an outlet box, and winged extensions connected to said lugs, the line of connection between the lugs and extensions being relatively weak whereby the extensions may be severed readily from the lugs."

The switches equipped with the devices described in these two patents which were put in evidence show that this second patent merely consists in making a score or cut into the metal of the so-called ears of the switch assembly so that they might be slightly weakened at such place as would make it convenient to break them off with pliers in case the workman who was installing the switch wished to make the support of the switch shorter in order that it might be covered by

a short covering plate or in order to install two switches end to end in one wall box.

The plaintiff's argument is that this scoring to permit of the convenient breaking off of the ears with a pair of pliers was an instance of what the plaintiff's counsel called a happy idea and claimed amounted to invention.

I do not agree. Certainly the weakening of a substance in the line of a proposed breakage thereof has, I suppose, been an expedient practiced since the beginning of the Stone Age.

I think that the most that can be said for the second patent is that the scoring which it taught was the foundation for a convenient commercial argument on which the seller of the switch with the ear attached as disclosed by the Switch Alignment patent could contend vis-à-vis his buyers that the scoring of the ears at the place where it would be convenient to break them off made it unnecessary for a workman to carry two kinds of switches, as he might have to do otherwise, in order to meet the exigencies of certain installations.

In reality, therefore, the device of this patent merely involved the natural response of a man experienced in the sale of electrical switch installation to the challenge which had been, or which he felt certain would be, made to him by the market.

Therefore, I hold the Scoring patent also invalid for want of invention.

IV. This opinion may stand as the findings of fact and conclusions of law required under Equity Rule 70½ (28 USCA § 723), and I will sign an order so providing. Hazeltine Corporation v. Radio Corporation (D. C.) 52 F.(2d) 504, 512; Lewys v. O'Neill (D. C.) 49 F.(2d) 603, 618; Briggs v. U. S., 45 F.(2d) 479, 480 (C. C. A. 6). Cf. also El Sol (D. C.) 45 F.(2d) 852, 856, 857.

Such an order and a decree in accordance with this opinion may be presented for signature on three days' notice.