## GENERAL ELECTRIC CO. v. LEVITON MFG. CO.
### No. 8043.

District Court, E. D. New York.
Feb. 16, 1940.

Stephen H. Philbin, of Boston, Mass. (Harrison F. Lyman, of Boston, Mass., A. E. Bobst, of Schenectady, N. Y., and Edgar H. Kent, of Boston, Mass., Esq., of counsel), for plaintiff.

Gifford, Scull & Burgess, of New York City (George F. Scull and H. H. Hamilton, both of New York City, of counsel), for defendant.

CAMPBELL, District Judge.

This is an action brought by the plaintiff for the alleged infringement, by the defendant, of Patent No. 1,567,863 (so-called Plaster Ear Patent), issued to Howard R. Sargent and Frank C. De Reamer, Assignors to General Electric Company, for House-Wiring Structure, granted December 29, 1925, on an application filed January 3, 1923. All nine claims are in suit.

The case is now on final hearing, a preliminary injunction restraining defendant pendente lite from infringing the Patent in suit, having previously issued on an order of this Court dated November 4, 1936 (Inch, J.), affirmed by the Court of Appeals in 2 Cir., 89 F.2d 1008.

This Patent was previously adjudicated, and held valid and infringed, as to claims 1 to 8, inclusive, in General Electric Co. v. Unites States Electric Mfg. Co., D. C., 56 F. 2d 630, affirmed, as to the Patent in suit at 2 Cir., 63 F.2d 764. In that case claims 1 to 8, inclusive, of the Patent were in suit, and were all held valid and infringed.

The Patent in suit relates to Electric House Wiring Devices. The invention is described by the patentees in the specification as follows:

"The present invention relates to house wiring and particularly to the mounting of switches or other electrical wiring devices, such as plug receptacles for example, in outlet boxes. In wiring houses the outlet boxes are usually fastened to the studding before the building is lathed and plastered and it often happens that boxes are set crooked so that the plane of the box opening is not parallel to the plane of the plaster surface. As a result when the switch or other device is mounted on the box it will stand crooked with respect to the plaster surface which means of course that the switch is not straight.

"The object of our invention is to provide an improved structure or arrangement wherein the switch will always come parallel with the plaster surface irrespective of the manner in which the box is set, and for a consideration of what we believe to be novel and our invention, * * *."

Plaintiff has title to the Patent in suit, and the required notice was given before this action was commenced, and defendant admits manufacture and sale of the alleged infringing devices (Exhibit 2).

The Patent in suit had, for its purpose, the provision of a simple and easy means for correctly aligning a switch or plug receptacle (sometimes termed a convenience outlet), with a surface of a wall. By the term, plug receptacle, as used in the

Patent in suit, is meant such a fitting as is commonly placed in a wall, to receive a plug to connect an electrically operated device in the room, with the electrical circuit in the building. In common practice switches or plug receptacles are mounted in open metal boxes, called outlet boxes, which are fastened to the studding, where the switch or receptacle is to be placed and customarily before the wall is lathed and plastered.

In Fig. 1 of the Patent in suit there is shown an outlet box at 5, attached to the studding 6 by means of screws 8 fastened through lugs 7 projecting from the ends of the box. The switches or receptacles, as shown in said Fig. 1, are mounted in the boxes by means of screws 16 passing through lugs at the ends of the switch or receptacle, and received in screw threaded apertures 18 in lugs projecting from the ends of the outlet box. The electrician returns after the lathing and plastering has been completed to mount the switches or receptacles, and as a rule finds that the open ends of the outlet boxes, in which these electric devices are to be set, are disposed below the surface of the plaster, and often finds that they are crooked with respect to it, because of the impossibility of determining when the boxes are set, just where the plaster surface will be when the wall is finished. Regardless, however, of the position of the outlet box, the face of the switch or receptacle must be aligned with the surface of the plaster, for the reason that if such alignment is not made, the switchhandle or receptacle will not project correctly through the face or cover plate with the result that there will be difficulties in operation and the appearance will be adversely affected.

According to plaintiff's expert, there were, prior to the invention of the Patent in suit, but two ways for properly leveling switches or receptacles, the traditional way being to build up the support at the ends the requisite distance by means of metal washers surrounding the attaching screws between the switch or receptacle lugs and the outer box lugs requiring not only the handling of a considerable number of small washers, but necessitating several trials before the proper number of washers at each end were hit upon. This is referred to in the opinion of the Circuit Court of Appeals of this Circuit, in General Electric Co. v. United States Electric Mfg. Co., 63 F.2d 764, 765.

The second way of leveling switches or receptacles, prior to the Patent in suit, was by means of a lock nut provided with a tang, an invention by Sargent, which was adopted commercially in 1913 or 1914, and used until it was superceded by the invention covered by the Patent in suit in 1922. This device was threaded on the attachment screws between the switch or receptacle lugs, and the box lugs, and by it the switch or receptacle could be levied by adjustment affected through the turning or attaching screws first in one direction, and then in the other. (Sargent Patent No. 1,173,040.)

Notwithstanding the fact that the last described device was "a time saver for wire man", as appeared with the wire system, it required considerable manipulation.

Defendant, however, contends that the problem had been solved prior to the Patent in suit, and that the Patent in suit had been anticipated or, at least, that there was no invention in any of the Claims in suit. The invention of the Patent in suit, as claimed, consists of providing the switch or receptacle with extensions, which will overlie the wall at the ends of the box and thus automatically align the switch or receptacle with the wall when it is secured to the outlet box.

The Patent in suit shows two forms of the invention, each applied to a wall switch. The one commercially adopted by the plaintiff, and its licensees, is shown in Figs. 1–3 of the Patent, and consists in extending the attachment lugs at the ends of the switch or receptacle beyond, and to the sides of the hole for receiving the attachment screw sufficiently so that these extended ends or plaster ears 13 will overlie the wall surface beyond the end of the outlet box, and beyond the point where the plaster is normally chipped away to expose the lugs at the end of the wall box into which the attachment screws enter. Figs. 1 and 3 of the Patent in suit show the outlet box 5, the switch or receptacle to be mounted therein 10, the metallic cross bar of the switch or receptacle which provides the attachment lugs at its ends 12, the apertures 17, through which the attachment screws 16 are fastened in the box lugs 7, and the extension or plaster ears 13.

Simple as may appear the invention of the Patent in suit, as a means of overcoming the difficulties of the Prior Art, it had eluded solution by a number of inventors, who had attempted to solve the

problem, and this is shown by the Patents issued to at least eleven, which were offered in evidence by plaintiff as Exhibit 11, but none of them ever went into use. The invention of the Patent in suit has gone into very extensive use, because of its extreme simplicity, economy and effectiveness. It was adopted by plaintiff as a standard construction in the Spring of 1922, and up to July 1, 1939, plaintiff had manufactured and sold some 26,800,000 of the patented devices. Seven licensees of plaintiff, who were manufacturers of this class of electrical devices, up to July 1, 1939, paid to the plaintiff royalties under those licenses on 57,800,000 of the patented devices. This has been referred to by the Circuit Court of Appeals in its opinion in General Electric Co. v. United States Electric Mfg. Co., supra, the figures of the sales by plaintiff, at that time, being only 15,500,000 and the number of devices on which royalties were paid by the licensees being only 17,800,000.

Defendant offered in evidence the following Prior Art Patents, and relies on them.

British Patent No. 102,167 issued to Herbert Edward Mitchell, for Improvements in or connected with Mountings for Electric Switches and Connecting Apparatus, complete accepted November 23, 1916, on application of January 15, 1916. That patent relates to improvements in, or connected with mountings for electric apparatus such, for example, as switches, connecting sockets, and bell pushers on walls, for partitions of buildings where these are enclosed in receptacles built into the walls—such as iron wall boxes used in connection with the tube system, of electric wiring, now in vogue. That patent was cited by the Patent Office against the application for the Patent in suit. It is directed to the doing away with the necessity of packing up the switch, by washers or the like, to align it with the wall surface, which is the same general purpose of that of the Patent in suit. Fig. 3 of Mitchell shows a wall box 16 and Fig. 2 a square box-like device, called a cradle, which is to be set, as shown in Fig. 3, with its four flanges 6, 6 resting on the surface of the plaster, which cradle is provided at its bottom with a plate 8 called a saddle, and is widened to a circle at its center and to which the switch 18 of Fig. 3 is to be attached by means of the screws 20 passing through the screw holes 15 in the saddle. As illustrated in Fig. 3, and also in Figs. 1 and 2, the cradle is attached to the wall

box by screws 21 at its four corners and these pass through the loops 14, formed in the saddle and enter threaded holes 23 (Fig. IIIA) in bosses 22 formed in the corners of the wall box. An alternative form is shown in Figs. IV–VII, inclusive, wherein the corner screws are replaced by a single central screw 28 passing through a central hole in the saddle, and engaging a central hole in the base of the wall box 32 to attach the cradle to the wall box. That patent was analyzed in detail in the opinion in General Electric Co. v. United States Electric Mfg. Co., supra, in which case it was held valid, and Circuit Judge Augustus N. Hand, writing for the Court, and comparing the device of Mitchell with a device like that of the Patent in suit, said, at page 766 of 63 F.2d, "The Mitchell device is a two part affair consisting of the 'cradle' with the attached 'saddle' and the switch. * * * In spite of the teachings of Mitchell, the old method of building up the crossbar with washers, continued for years. That method at least involved the use of only a few small washers, and did not require the cradle and saddle of Mitchell with their cumbersome method of installation and considerable additional expense."

The two parts of Mitchell's device are: first, the cradle with attached saddle, and the second, the switch. The electrician must secure and set in place in the wall box the cradle with attached saddle before the switch is attached to the saddle. This clearly appeared by reference to Fig. VII, and although it is not so apparent, when one considers the form shown in Figs I–III, inclusive, it is true in those Figures also. To install the Mitchell device in an outlet box, half filled with tangled wires, which is typical of their condition when found by the electrician when he comes to install the switch or receptacle, presents many difficulties, and renders the Mitchell device of no practical value, because of its cumbersome method and expense.

Not only did Mitchell not solve the problem it seems to me, that was presented, but considering the difficulties attendant upon the installation of the switch and receptacle, as shown in his patent, the washer system would be preferable. The device of the Patent in suit, however, may be installed by simply setting it in place and fastening it to the wall with two screws, as the leveling ears are attached to the receptacle structure itself, and do not have to be separately installed.

The Mitchell patent was fully passed upon by the Circuit Court of Appeals of this Circuit, in General Electric Co. v. United States Electric Mfg. Co., supra, and also by Judge Inch, when he granted the preliminary injunction in the case at bar, and by the said Circuit Court of Appeals of this Circuit when it affirmed his decision.

The Mitchell patent was cited as a reference by the Patent Office on the application for the Patent in suit but the Patent in suit issued over it.

Although defendant again urges that the Mitchell patent anticipates, I find nothing in the evidence or the argument of Counsel, on its behalf, that would lead me to the belief that defendant has shown anything on this trial, which if shown on the trial of the former case, or in opposition to the motion for a preliminary injunction in this case, which if shown before Judge Inch, or the Circuit Court of Appeals, would have changed their opinions. The Mitchell patent does not anticipate.

Patent No. 1,275,691 to Harvey Hubbell for Means for Leveling and Alining Face-Plates, granted August 13, 1918, on an application filed November 17, 1915. That patent relates to means for leveling and aligning face-plates. This patent was also cited as a reference by the Patent Office on the application for the Patent in suit, but the Patent in suit issued over it.

The device shown in the Hubbell patent was never used commercially, and Harvey Hubbell, the patentee, was the first to take a license under the Patent in suit.

As stated by the patentee in the specification of the Hubbell patent, his "invention relates to the class of electric and other fixtures which are adapted to be seated in wall pockets, and are provided with finished, face-plates, and the invention has for its object to provide simple and inexpensive means for leveling the fixtures in the wall pockets, and for aligning the face-plates without tentative adjustments."

After describing the difficulties which he sought to overcome, Hubbell further said "This difficulty and the loss of much time of highly paid workmen is avoided by the use of my present invention, which consists in providing the fixture with an alining plate, that overlies the pocket and is alined with wall, baseboard or casing, as may be required, before the face plate is attached, after which the receptacle is secured in place and the face plate attached to the alining plate, the face plate necessarily assuming the precise alinement of the alining plate."

It thus appears that Hubbell did not, as in the Patent in suit, provide for aligning purposes extensions of the projecting lugs at the ends of the receptacle to overlie the plaster, but did for that purpose employ a large plate 14 overlying the whole receptacle body, and projecting beyond its sides to the right and left. The use of Hubbell's proposed separate leveling plate would not only involve additional cost, but would also be subject to the following objection, that is, that the electrician would be required to perform the additional operation of attaching the plate to the switch after the completion of the wiring; the actual leveling by the electrician himself, by nicely balancing the tension of the attaching screws, because of the fact that notwithstanding appearance on the surface, the leveling plate is not self leveling, as it projects sidewise and not longitudinally of the device, and the unreliability of the condition of the plaster at the sides of the wall box in practice, as a supporting means.

The Hubbell patent did not teach the patentees of the Patent in suit how to solve the problem which confronted them.

The electric device (receptacle) and the leveling means, in Hubbell, are separate parts, to be assembled and secured together by the electrician on the job. This is quite clear because with the plate in position on the receptacle it would interfere with operation of attaching wires to the binding posts of the receptacle, making operation impossible if the receptacle were adapted to top wiring and greatly impeding it if the receptacle were arranged for side wiring.

The Hubbell device, like the Mitchell device, is a two part affair. The leveling plate of Hubbell, like the cradle of Mitchell, is a separate part from the switch, requiring the electrician in installing the device to perform the extra operation of attaching the plate to the receptacle.

In the device of the Patent in suit the wall-engaging extensions are at the ends of the device. They offer no obstacle in wiring and the device can be furnished with the plaster ears attached, and may be installed by simply securing the attaching screws to the box.

In the installation of the Hubbell device adjustment of the screws is required by trial and error, with the possibility that even then they are not properly adjusted,

584

due to the fact that the plate projects sidewise of the receptacle and in being installed the aligning plate 14 may be bowed at each end under pressure of attaching screws.

It is doubtful whether the plate could be made heavy enough, by thickening, to prevent such bowing or bending due to the limited space between the face of the receptacle and the inner surface of the cover plate, but even if that could be done, the attachment screws 19 being located beyond the ends of the plate the tightening of one screw 19 will lift the other end off the plate and permit the screw to draw the lug below the wall surface.

If this was noticed by the wireman, he would adjust the screw 19 to level the device and if it was not the device would be out of alignment with the wall face. In any event adjustment would not be automatic, but depend on the care and skill of the electrician. The devices of the Patent in suit on the contrary are self aligning, as all that the electrician has to do is to set the receptacle in place, and screw in the attachment screws as far as they will go. In the Patent in suit the leveling support for the receptacle is immediately adjacent the attachment screws, relieving from the danger of bending or tipping, resulting in faulty alignment.

Subsequent to the trial defendant has presented a stronger steel plate, but that not having been presented on the trial, I cannot consider it.

Hubbell's plate cannot be extended much beyond the sides of the wall box without requiring a special plate, wider than standard.

If the plaster were not chipped away in that area, a slight overhang beyond the side wall of the box might give adequate support, but in practice the plaster is often extensively broken away about the box and Hubbell's plate would have very little support on the plaster.

In the Patent in suit the greater length than width of the face plates furnishes adequate bearing wall surface at the ends of the device, the location of the plaster ears, the available space at the ends being some two and one half that at the sides.

Not only would alignment by the old washer system be quicker and easier than leveling with Hubbell's plate, but Hubbell's large metal plate will be much more expensive to make than the plaster ears of the patent in suit.

What Hubbell thought of the leveling means of his patent No. 1,275,691 relied on by defendant is best shown by failing to make any use of it and taking the first license under the Patent in suit, and also by having patented in a later applied for patent No. 1,275,692 (Ex. 14) a receptacle having adjustable end lugs by which the device could be leveled, similar in principle to the adjustable leveling devices of the patents shown in Exhibit 11. It is to be noted that in Fig. 7 of the patent 1,275,692 Hubbell shows a switch equipped not only with these adjustable ears, but also with "an aligning plate" substantially like that of patent No. 1,275,691 and that patent says that this plate "may or may not be used".

If the aligning plate of the earlier patent was adequate for the accomplishment of its intended purpose, why was the complicated means of the later patent for adjustable leveling devices provided?

The contention of defendant that the "aligning plate" of the Hubbell patent No. 1,275,691 is secured to the attachment lugs at the ends of the device and that, therefore, Hubbell's plate must be considered as "associated with said lugs", as specified in Claim 1 of the Patent in suit, is not sustained, as the statement that Hubbell's plate is secured to his attachment lugs is erroneous.

The screws 22, which fasten the Hubbell plate to the receptacle, are secured to the inner ends of the metal members 18, not to the projecting ends of the crossbar. It is not the manner in which the leveling devices are attached to the receptacle that is significant, but it is their location as stated in Claim 1, "means providing lugs at the ends of the device", and in Claim 3, "means carried by the device and projecting beyond it to provide attaching members."

By the use of the term "associated" in Claim 1 and similar terminology in other Claims of the Patent in suit the patentees described the location of the wall-engaging projections adjacent to the attachment lugs, at the ends of the device. This is not found in Hubbell, as there the wall-engaging portions of the "aligning plate" are placed at the sides of the device, between and remote from the lugs, a position in which I do not believe they would operate satisfactorily.

I cannot agree with defendant's expert that there is no difference in function between the Hubbell aligning plate and the plaster ears of the patent in suit, and that

it makes no difference whether a leveling device contacts the walls at the side, or ends of the outlet box, as I believe I have clearly pointed out the difference that does exist.

I have devoted some space to the discussion of the Hubbell patent, which had not been previously discussed by other Courts, as defendant's expert selected the Mitchell and Hubbell patents, as the closest in their disclosures to the Patent in suit, and was unable to choose between them. I have hereinbefore found that the Mitchell patent did not anticipate and I now find that the Hubbell patent did not anticipate any of the Claims of the Patent in suit.

Both of these patents relate to lamp sockets for mounting in the ceiling, that is, speaking of the patents Nos. 1,395,084 and 1,573,440, which I will now consider.

Patent No. 1,395,084 to Reuben B. Benjamin, Assignor to Benjamin Electric Manufacturing Company for Outlet-Fitting, granted October 25, 1921, on an application filed June 28,. 1915.

Patent No. 1,573,440 to Reuben B. Benjamin, Assignor to Benjamin Electric Manufacturing Company, for Outlet-Fitting, granted February 16, 1926, on an application filed November 21, 1917.

Defendant's expert considers these two patents less pertinent than the Mitchell and Hubbell patents, and therefore I will consider them together.

In patent No. 1,395,084 there cannot be found anything about leveling function.

In patent No. 1,573,440 leveling function is mentioned only in a passage that was added by amendment filed June 21, 1921 and cannot be relied on against the Patent in suit, the invention of which it was stipulated, was conceived on or before February 12, 1919, and reduced to practice during the year 1919.

The device of neither of the Benjamin patents was used commercially.

The structure relied on as anticipating the Patent in suit, in patent No. 1,395,084 is that shown in Fig. 4, the outlet box cover plate 63, which carries the socket, and, because it is shown as projecting slightly beyond the periphery of the outlet box, it is offered by defendant as corresponding with leveling means of the Patent in suit.

The structure relied on as anticipating in patent No. 1,573,440 is shown in Figs. 1 and 2; the bracket 34 which carries the lamp fixture socket, being offered by the defendant, as constituting a leveling means, because in Fig. 1 its right hand is shown as projecting considerably beyond the outlet box, and its left hand is shown as projecting only a trifle beyond the outlet box.

If the cover plate and bracket of Benjamin possess any leveling function it was undesigned by that patentee, who not only failed to mention any such function in the specification, except in the amendment to the second application which as I have before stated must be disregarded, but also because neither the cover plate of the first Benjamin patent, nor the bracket of the second is shown as performing any leveling function.

The outlet boxes in both patents are shown flush with the ceiling, therefore, no leveling engagement of the plate, or bracket with the plaster around the box is needed or performed.

Neither of these patents shows means capable of any leveling function, which the patent in suit was designed to, and actually does perform by its plaster ears.

The bracket shown in Figs. 1 and 2 of patent No. 1,573,440 would not function satisfactorily to align the device with the ceiling if the outlet box were above the level of the plaster, because, as shown in Fig. 1, the left hand end of the bracket projects beyond the outlet box for a distance of only approximately equal to one half the diameter of an attachment screw, and the cover plate of Fig. 4 of patent No. 1,395,084 is shown as projecting only about the same distance beyond its outlet box, and such a small projection would be inadequate to provide leveling contact with a wall in actual practice.

Defendant's expert says that these projections would be sufficient to give leveling contact if the plaster were brought right up to the edge of the outlet box, but although it is so shown in the Benjamin patents, and defendant's wooden models, it rarely if ever occurs in practice.

The Benjamin patents do not anticipate.

The Hubbell and Benjamin patents cited by the defendant, for the first time on this trial, are no better references than Mitchell which does not anticipate, nor do they anticipate the Patent in suit, and we must not overlook the fact that the Hubbell patent was cited as a reference against the application for the Patent in suit, in the Patent Office, and that the Patent in suit issued over it.

■ Defendant contends that the Patent in suit is the result only of the work of a skilled mechanic and does not represent invention, but this contention is not sustained, on the contrary, however simple the invention may seem, it was arrived at only after many inventors, including Hubbell, had sought for, and failed to find the solution of the problem, solved by the patentees in the Patent in suit.

■ The Patent in suit is valid.

We will now consider the question of infringement.

The Patent in suit No. 1,567,863 contains 9 Claims, all of which are in suit.

Claim 1 reads as follows: "1. The combination with a wall, and an outlet box fastened directly in the wall, of an electrical device in the box, means providing lugs at the ends of the device, fastening means in the lugs which attach the latter to the box for supporting the device in the box, and projecting means associated with said lugs and fastening means and adapted to overlie the wall at the edge of the box for holding the electrical device in alignment with the wall."

Claims 2, 4 and 7 define the plaster ears as "carried by" the attachment lugs or cross-bar.

Claims 3, 5, 6 and 8 define the plaster ears as "integral with the lugs or cross bar".

Claim 9 does not contain the words "carried by" or "integral" but it does provide for "an attachment lug having an opening to receive a fastening means for attaching it to an outlet box," and further referring to said box "being provided at one side of said opening with means for use in attaching it to an electrical device and at the other side opening with projecting wall engaging means."

One of the defendant's alleged infringing devices with the carton in which it was sold, containing the legend "Duplex Flush Receptacle with Plaster Ears" is in evidence as Exhibit 2, and another of them is installed at the point marked E in the Wall Section in evidence as Exhibit 7.

The only difference, of any consequence in this case, between defendant's alleged infringing device, and the device shown in the Patent in suit, is that in defendant's device the "plaster ears", instead of being physically attached at the outer ends of the cross-bar by which the device is connected to the outlet box, are formed of separate pieces of metal which surround the ends of the cross-bar and are clamped in place between the top and bottom portions of the insulating body.

The plaster ears of defendant's device perform the same function, in the same way, as the plaster ears of the Patent in suit. With respect to the body of defendant's device, the plaster ears occupy the same position as they would if attached to the outer ends of the cross-bar, and in aligning they function the same as they would if they were so attached.

Claim 1 of the Patent in suit so clearly reads on the defendant's device, that it is unnecessary to compare their respective elements. The word "associated" as used in Claim 1 is certainly met by the defendant's device, in which the projecting means are placed on the device immediately adjacent to and surrounding the lugs, and cooperate with the lugs in the performance of the aligning and fastening function.

Defendant does not escape infringement by making its ears in separate pieces of metal, and inserting them in the rest of the device.

This is likewise true, as to the other Claims as to which infringement cannot be avoided by the defendant, by making its plaster ears in two parts instead of one part, as in the Patent in suit. The test is, do the two parts of defendant's device function the same as the one part of the Patent in suit, and I find that they do.

The Prior Art or the history, in the case at bar, do not restrict the interpretation of the words "integral with", or "carried by", as found in Claims 2 to 8, inclusive, but they are to be interpreted as including the plaster ears and attachment lugs on the defendant's alleged infringing device, which are physically separated, but functionally unitary.

While Claim 9 does not contain the words, "carried by" or "integral", it seems to me that Claim 9, by its terms, clearly reads upon the defendant's alleged infringing device.

The accused device of the defendant infringes the 9 Claims of the Patent in suit, and that is; all the Claims of the Patent in suit.

A decree may be entered in favor of the plaintiff against the defendant with injunction and costs and the usual order of reference.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law, in accordance with this opinion, for the assistance of the Court, as provided by the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, and the Civil Rules of this Court.